## THE BOARD OF CHOSEN FREEHOLDERS OF PASSAIC COUNTY v. EUGENE STEVENSON.

1. The act of March 12th, 1880, (*Pamph. L., p.* 321,) is a local and not a general law. The grouping together in a single act of a number of special or local laws does not constitute a general law.
2. Whether the requisite notice has been given of an intention to apply for the passage of a local law is a subject matter for judicial inquiry under article IV., section 7, paragraph 9, of the constitution.
3. The admissions of parties to the suit are not competent proof to show that due notice has not been given. What the law is cannot be determined by the agreement of suitors.
4. Salaries of prosecutors of the pleas must be fixed by general and not by local laws. Such laws regulate the internal affairs of counties.

On error.

For the plaintiff in error, *John W. Griggs.*

The act under which the question for decision in this cause arises is as follows :

"An act to provide for the payment of fixed annual salaries to the several prosecutors of the pleas in this state.

" 1. *Be it enacted by the Senate and General Assembly of the State of New Jersey,* That from and after the passage of this act there shall be paid to the several prosecutors of the pleas in this state fixed annual salaries in lieu of fees, and at and after the following rates, viz. : to the prosecutors of the pleas of the counties of Atlantic and Ocean, each the sum of four hundred dollars ; to the prosecutor of the pleas of the county of Hunterdon, six hundred dollars ; to the prosecutor of the pleas of the county of Morris, fifteen hundred dollars ; to the prosecutor of the pleas of the county of Monmouth, twelve hundred dollars ; to the prosecutor of the pleas of the county of Mercer, eighteen hundred dollars ; to the prosecutor of the pleas of Passaic county, two thousand dollars ; to the prosecutor of the pleas of the county of Hudson, the sum of seven thousand

dollars, and he shall defray the expenses of his assistant out of the salary so paid ; that all of the salaries so fixed shall be paid in quarter-annual payments by the collectors of the several counties.

" 2. *And be it enacted,* That the said salaries shall be in lieu of all fees, costs and compensation or allowances now received by them or to which the said prosecutors of the pleas shall be entitled under existing laws, and all such fees, costs, compensation or allowances shall be taxed in all bills of costs, the same as now taxed, and shall be collected by the sheriffs of the several counties, and be by them paid over to the respective county collectors for the use of the said counties.

" 3. *And be it enacted,* That the salaries of the prosecutors of the pleas in the counties not herein specifically named, and which were heretofore fixed by special acts, shall be continued as thus established.

" 4. *And be it enacted,* That this act shall take effect immediately.

"Approved March 12th, 1880.".

The relator was appointed to the office of prosecutor of the pleas in March, 1881, a year after the passage of this act. His claim for compensation at the old fee rate is based upon the assumption that this act is void because, being a special act, no notice of the intention to apply to the legislature for its passage was given. The constitutional provision thus invoked is paragraph 9 of section 7 of article IV. of the amended constitution, to wit:

" No private, special or local bill shall be passed unless public notice of the intention to apply therefor, and of the general object thereof, shall have been previously given. The legislature, at the next session after the adoption hereof, and from time to time thereafter, shall prescribe the time and mode of giving such notice, the evidence thereof, and how such evidence shall be preserved."

This is not a special act within the meaning of the constitution such as to need a previous notice of intention to apply for its passage. In *Woodruff* v. *Freeholders,* 13 *Vroom* 533,

the Supreme Court held that this act now in question was special. The circumstances of that case were different from those involved in this case. The relator in that case objected to the validity of the act as applied to him because it was sought to decrease his allowance as a public officer during the term for which he was appointed, and rested his claim under paragraph 11, section 7, of article IV. of the constitution. No question of the validity of the act as applied to officers appointed after the passage of the act was raised. The matter of notice was in no way involved.

In the present case the Supreme Court, simply following the decision of the same court in the Woodruff case, declare the act special, and, upon the admission of the parties that no notice was given, declare the act wholly void. The decision in the present case, it will be perceived, is much more serious, and involves much more important consequences than the former one. It unsettles the salary system, as applied to these officers, in every county in the state where local acts do not apply, and, if sustained by this court, will leave, without doubt, accountings to be taken in every county between the prosecutors and the county authorities, to determine whether the prosecutors have been overpaid, or the reverse. It is easy to see how, in the Woodruff case, the court, having in view the sole object of preventing a decrease of the salary of a public officer during his term of office, may have been naturally moved to view the act in a light which would prevent what is ordinarily considered an act of injustice.

The importance of the act, and the far-reaching results of the decision in this case, have induced the county authorities to submit the constitutionality of this act to the final determination of this court. It is submitted that a careful consideration of the object and form of the·act will lead to a different view from that taken by the Supreme Court.

Is this a special law? That it was intended by the legislature to be a general act is unquestionable. It was not passed upon the *application* of any person. It was one of several acts intended to abolish the fee system and to provide for the

payment of public officers by a salary. The act providing for the payment of the justices of the Supreme Court and the Chancellor by a fixed salary was passed the same year. The *object* of the act in question was to wholly abolish the fee system as applied to the public prosecutors, and to establish a salary system in its stead. This had already been done in several counties, and the object was at this time, by one general act, to throw the whole state under this system. There is no attempt at special classification; every county is included in the sweeping abolition of the fee system. A fixed salary is also provided for the prosecutor of every county. This, so far, is a strict compliance with the law of general legislation as laid down by the courts of this state. *Van Riper* v. *Parsons*, 11 *Vroom* 1, 123; *Rutgers* v. *New Brunswick*, 13 *Vroom* 51. But while this generality of scope in the statute in question is not alluded to by the Supreme Court in its opinion in Woodruff v. Freeholders, the fact that the salaries substituted for the fees as compensation are not of the same amount is seized upon, and declared to be the test of the quality of the act.

The court cites *Thomas* v. *Board of Canvassers*, 5 *Ind.* 4, (an overruled case, see *Gentile* v. *State*, 29 *Ind.* 409,) to the effect that " to make a law general it should have a uniform operation upon some general principle applicable to the object." Also *Van Riper* v. *Parsons, supra,* that " a law which does not operate equally on all of the class to which it relates, but creates preferences and establishes inequalities, is not a general law." It should be borne in mind that the peculiar object of legislation under discussion in Van Riper v. Parsons was municipal corporations.

As remarked by Mr. Justice Magie in *Skinner* v. *Collector*, 13 *Vroom* 407, " each of such laws, [that is, laws objected to as special,] when brought to the attention of the courts, must be considered with reference to all the circumstances involved, and which were in the mind of the law-maker, and the evident intention of the law. And in deciding the delicate questions thus arising, the opposition between the constitution and the law must be such as to produce in the mind of the court

a clear and strong conviction of their incompatibility with each other before it will interfere with the law-making power."

How far must this doctrine of generality be extended? Must it be carried to every incidental and collateral effect of the statute, or should we not rather look at the main purpose of the act, its general object, to discover whether it is general or local and special? The object of this act, its main purpose, as before stated, was to abolish the fee system, to which, particularly as applied to this office, there were grave objections. The legislature did not simply abolish the system in Passaic county—they abolished it absolutely in every county.in the state. The act did more: (1.) It established a universal rule that in every county the stated salary should be in lieu of all fees. (2.) That in every county the former fees should be taxed in the bills of costs and collected by the sheriffs and paid over to the county collectors. (3.) That the said salaries should be paid by the collectors quarterly.

But, it is said, that was not sufficient to make it a general act; it should have gone further, and classified the salaries otherwise than by the respective counties; and it is alleged in the opinion of the Supreme Court that the salaries are not fairly regulated. But I know of nothing before the court to prove the assertion of unfairness. The population of a county is no fair test of the amount of service of a public prosecutor. Counties made up of rural population, although equal in number of inhabitants, have much less criminal business than those comprising large cities within their limits, or located near to the great cities of New York or Philadelphia. The amount of criminal business is not determined so much by the number as by the character of the inhabitants. The prosecutor should be paid according to the amount of labor he is likely to be required to perform. His case in this respect is unique. Were the salaries to be fixed on the basis of population, the officers of counties like Camden and Passaic, where there is a large criminal element, and consequently more labor required of the prosecutors, might well complain that they were dealt with unequally to be put on the same footing

as the prosecutors of Morris or Monmouth. Nothing could in fact be more unfair and unequal than to fix these salaries upon the classification of counties based upon population, as fixed by the statute of 1883, page 20.

The legislature, made up of assemblymen and senators from each county, has fixed these salaries at what they considered a fair sum, so as to make an equality based upon the amount of labor performed. It is fair to presume that the legislature *is* as competent to judge of the justness of these amounts as the courts. That they were equal and fair is proved by the fact that they have been acquiesced in in twenty counties up to the present time. And objection was not made to the courts by the present relator until after two years' service, during which he was paid at the salary rate. See on this subject of establishing uniformity by arbitrary classification, *State* v. *Judges, &c.*, 21 *Ohio* (*N. S.*) 1, 11, as follows:

" The result of any uniform rule, operating throughout the state, whether the compensation is made payable by fees or salary, would be either to make the compensation of officers inadequate in small counties, or exorbitant in the larger and more populous ones. The attempt to graduate the compensation by population, might, in many instances, wholly fail to accomplish the desired object. The character of the pursuits of the people, and of the locality itself as a commercial or manufacturing centre, form important elements in determining the compensation necessary to secure the requisite qualifications and force to properly discharge the duties of local offices."

The inequality is not at any rate so apparent as to render it the duty of the court to " interfere with the law-making power." When the constitutionality of an act is merely doubtful it is the duty of the court to sustain it. *Stocking* v. *State,* 7 *Ind.* 326 ; *Skinner* v. *Collector,* 13 *Vroom* 407.

To declare this a special law is to declare that notice should have been given of the intention to apply to the legislature to have it passed. Note the use of the word " apply " in the constitution, paragraph 9, section 7, article IV. · That which

is devised by the legislature itself, without application from any one, can hardly be called the subject of such a notice. Where would you advertise the notice to be given for this act? Who would sign it? Do not these considerations show that the act is essentially public and general? It relates to officers of the state, not to any municipal government or private individual, interest or concern. The legislature should not be restricted in its dealing with its own officers. It is not a parallel case to legislation intended to confer corporate powers upon subdivisions of the state; and the reasoning to be applied to the latter class of cases seems inappropriate to this case.

The constitution of Indiana expressly requires that all general laws shall have a uniform operation throughout the state. So do the constitutions of California, Florida, Georgia, Iowa, Kansas, Nevada and Ohio. New Jersey has no such provision except as to the assessment of taxes. In Indiana a special statute is defined to be such a one as the courts would not notice unless it were pleaded and proved like any other fact. *Hingle* v. *State*, 24 *Ind.* 28; *Railway Co.* v. *Nordyke*, 27 *Ind.* 95. An act relating to the compensation of certain county officers in New York county, was held to be neither private nor local. *Conner* v. *Mayor*, 5 *N. Y.* 285; *Williams* v. *People*, 24 *N. Y.* 405. Such an act concerns the inhabitants of the whole state. So the act in question concerns the whole state. It is a general and complete change of policy in the system of compensation to a whole class of state officers, and establishes a uniform rule applicable to all counties, both in the establishment of a salary, and in the method and times of payment, as well as in the disposition to be made of fees. To turn aside from these general purposes of the act to criticise it because of its failure to set up an arbitrary and artificial classification of salaries of these officers, seems to be contrary to the real spirit of the constitution, rather than in accordance with it.

It is respectfully submitted that the judgment of the Supreme Court was erroneous and should be reversed.

For the defendant in error, *Eugene Stevenson.*

I. The act of March 12th, 1880, (*Pamph. L., p.* 321,) was decided by the Supreme Court to be special, and therefore within the prohibition of paragraph 11 of section 7 of article IV. of the amended constitution. *Woodruff* v. *Freeholders of Passaic,* 13 *Vroom* 533. The provisions of this section show a plain intent of the constitution to compel the passage of general laws on the subject of the compensation of all public officers. The propriety of having this subject covered by general laws cannot be questioned. The court say, in *Woodruff* v. *Freeholders, supra,* that "there can be no difficulty in framing" such a general law regulating the compensation of prosecutors. Perhaps it may be questioned whether the law in question is not one "regulating the internal affairs of counties." If the legislature, by a salary act, can practically abolish the office of prosecutor in one county and make it a very important and lucrative one in another, such legislative action would seem to be directly in the way of "regulating the internal affairs of counties."

But I do not insist on the above points. I only refer to them to show that the spirit, at least, of our amended constitution is against all special laws affecting the compensation of public officers.

II. The law in question comes within paragraph 9, and is void unless the "public notice" prescribed by that paragraph and the law of 1876 (*Pamph. L., p.* 11,) was duly advertised. It is admitted that no public notice whatever was given.

1. The case of *Woodruff* v. *Freeholders, supra,* decides that the act in question is a special act. No distinction can be taken between the meaning of the word "special" in paragraph 11 and the meaning of the same word in paragraph 9. The two paragraphs are close together. Paragraph 9 says that "no private, special or local bill shall be passed" without public notice. Paragraph 11 provides that in certain cases no "private, local or special laws" shall be passed whatsoever. The word "special" clearly is used in the same sense

in the two paragraphs, and therefore I submit that the case of Woodruff v. Freeholders decides the present case.

2. If any law or bill could be held special within the meaning of paragraph 11, but not special within that of paragraph 9, this act of March 12th, 1880, cannot be so defined. It is within the reason and spirit of paragraph 9, and is both local and special, as those words are therein used.

(1.) The old system of fees for convictions, with its manifest disadvantages, had this merit—that it gave compensation in proportion to the work done. It is extremely difficult to frame any general act that will fairly apply even to the counties of a single class, except by allowing compensation in proportion to the number of criminal cases. The amount of business as indicated by the criminal statistics of each county should be the principle upon which to base a general law regulating the compensation of prosecutors. Any law based on population would be extremely inequitable.

The law does not pretend to be based on any principle. It is special and local in all senses. See remarks of Parker, J., in *Woodruff* v. *Freeholders, supra.*

I respectfully submit that this act of 1880 illustrates the very mischief which paragraph 9 was intended to remedy. If public notice had been given in the newspapers of the eight counties named in the law, the public authorities would have been informed of what was intended to be done, and the injustice and impolicy of fixing $2000 as the salary of the prosecutor of the third county in the state might have been avoided.

(2.) There is a peculiar and very cogent reason for requiring the "public notice for a law changing the percentage or allowance" of a public officer. Such a law, if special in the sense of paragraph 11, does not apply to persons in office. Therefore, the incumbent, unless he expects re-appointment or re-election, has no interest in such laws. After the successor comes in no change can be made even with full notice and advertisement.

To hold this act of 1880 special under paragraph 11, but

not special in the sense of paragraph 9, would therefore be extremely impolitic. In a word, if a law is special so as to be within the absolute prohibition of paragraph 11, *a fortiori* should it be held special within the qualified prohibition of paragraph 9.

But to discuss any possible distinction between the meaning of any of the three words "private," "special," and "local," as used in paragraph 9 and as used in paragraph 11, seems a waste of time. No distinction can be suggested. The case of *Woodruff* v. *Freeholders of Passaic, supra*, in deciding this salary act of 1880 to be a special law, therefore, has decided this case.

VAN SYCKEL, J. An act was passed March 12th, 1880, entitled "An act to provide for the payment of fixed annual salaries to the several prosecutors of the pleas of this state." The first section provides that in eight counties therein named, of which Passaic is one, the prosecutors of the pleas shall receive fixed annual salaries instead of fees. The salaries given vary in amount, the highest being $7000 and the lowest $400. *Pamph. L.* 1880, *p.* 321.

At the passage of this act special laws existed, which had been enacted from time to time, providing for salaries instead of fees to the several prosecutors of all the other counties. The salaries fixed by these special laws also varied in amount.

The third section of the act of March 12th, 1880, provides "that the salaries of the prosecutors of the pleas in the counties not therein specifically named, and which were theretofore fixed by special acts, shall be continued as thus established." Stevenson was appointed prosecutor of Passaic after the passage of this act, and if it is constitutional it regulates his compensation.

The first question involved is whether this is a special and local law within the meaning of paragraph 11, section 7, of article IV. of the constitution of this state.

The effect of the act is to abolish the fee system in the whole state, and in this respect it is general in its operation. But it

was manifestly the intention of the legislature that fixed salaries should be substituted for the fees swept away, and therefore, unless the substitution is legally made, the purpose of the legislature would not be effected by enforcing it, and the entire act must fall. The test of validity is whether the act is local in respect to the fixed salaries established by it. To make a law general it must have a uniform operation upon some general principle applicable to the subject. *Thomas* v. *Board of Canvassers*, 5 *Ind.* 4.

A law which does not operate equally on all of the class to which it relates, but creates preferences and establishes inequalities, is not a general law. *Van Riper* v. *Parsons*, 11 *Vroom* 1. The salaries fixed by this law are governed by no general rule, according to population or service rendered. It is arbitrary, and creates the most glaring inequalities. The salary for Passaic, with a population of sixty-eight thousand, is $2000, while that for Union, with a population of fifty-five thousand, is $3000, and $4000 for Camden with a population of sixty-two thousand.

The constitutional amendment was designed to repress such preferences, and to secure uniformity in legislation. The grouping together in a single act of a number of special or local laws does not constitute a general law. This legislation is not general in its operation and effect, and is as clearly within the constitutional prohibition as if eight several acts had been passed, each applying to one of the counties named in the act of March, 1880. It is in evasion of and not in conformity with the requirement of the fundamental law. *Woodruff* v. *Freeholders*, 13 *Vroom* 533.

This law, being special and local, can it be adjudged to be void for failure to comply with the amendment to the constitution which provides that no private, special, or local bill shall be passed unless public notice of the intention to apply therefor, and of the general object thereof, shall have been previously given? This amendment further provides that the legislature, at the next session after the adoption thereof, and from time to time thereafter, shall prescribe the time and

mode of giving such notice, the evidence thereof, and how such evidence shall be preserved.   Prior to the adoption of this amendment it had been declared by the Supreme Court of this state in *Pangborn* v. *Young*, 3 *Vroom* 29, that an enrolled statute of this state carries within itself conclusive evidence of its own authenticity.   The provisions of the constitution then in force, prescribing the mode of legislative proceeding in the enactment of statutes, were that all bills should be read three times in each house before the passage thereof; that no bill or joint resolution should pass unless a majority of all the members of each house were personally present, agreeing thereto; that the yeas and nays of the members voting on such final passage be entered on the journal which each house is directed to keep of its proceedings and from time to time to publish.

In the case cited, the Chief Justice, in a very able opinion in which I fully concur, held that the minutes of the two houses, or either of them, although kept under the requirement of the constitution, could not be received to show that the law as actually voted on and passed, and approved by the governor, was variant from that filed in the office of the secretary of state.   The extremely uncertain character of the evidence furnished by the journals was discussed by the court in reaching its conclusion that the mandates of the constitution prescribing the mode of legislative procedure were addressed to the legislative branch of the government alone, and that judicial inquiry could not go behind the sanctions which the legislature had provided for the authentication of its acts.

Without such journals it would be impossible for legislators to know the situation of the vast number of bills before them. The inference, therefore, to be drawn from the injunction to keep a journal is that it is intended for the information of the legislative body alone, and not for the perpetuation of testimony to be used in judicial investigation.

After this decision had been promulgated the constitutional amendment now involved was drafted.   It was agreed to by two successive legislatures, canvassed before the people, and

adopted by popular vote. It must be presumed to have been carefully drawn to effectuate a well-considered object. The members of the commission which framed it had before them the then existing clauses of the constitution, which have been adverted to, and well knew the interpretation they had received. If they had intended that the legislature should be the final arbiter, that end would have been attained under the construction adopted in Pangborn *v.* Young, by providing that notice should be given and that the legislature should prescribe the time and place of giving notice.

The superadded words in an instrument subjected to the most careful consideration of many legal minds, and so deliberately adopted as a constitutional amendment, must be presumed to have been used for a purpose which, without them, would not have been expressed.

The injunction in the amendment is that at the next session of the legislature after its adoption the legislature shall not only prescribe the time and mode of giving notice, but what shall be the evidence thereof and how such evidence shall be preserved. Some reasonable meaning must be ascribed to this language; it cannot be rejected as surplusage.

The legislative body could have no use for such evidence after the bill has passed; nor can I conceive that it is one of the functions of a subsequent legislature to resolve itself into a court to try a question of fact in order to determine whether a prior legislature had kept within the constitutional restraints. If the fact of giving notice could not be thereafter challenged in the courts, the evidence, instead of being preserved, might as well be cast into the waste-basket. The only purpose for which it can reasonably be believed that the evidence is perpetuated is, that it may be used in a judicial investigation whether due notice has in fact been given.

There is no uncertain or doubtful implication in this respect. The preservation of the proof as evidence necessarily implies, in law, its competency and admissibility in courts of justice; as clearly so, to the legal mind, as if it had been so expressed. Evidence required by the organic law to be preserved after

the legislature has, in obedience to the constitutional mandate, perpetuated it, must have all the qualities of evidence in its ordinary legal acceptation in the absence of words of exclusion and of express limitation to some specific purpose. Otherwise, after the law-maker has carefully preserved the evidence, it is not evidence, and thus the constitution and the law-maker have united in creating something which is nothing. In my judgment the intention is clearly expressed to vest in the judicial tribunals the power to arrest the operation of laws passed, in the haste of legislation, without the requisite notice.

Such, I believe, was the almost universally-accepted interpretation of this amendment when it passed, and the legislature acting upon it at the first session after its adoption enacted the law now upon our statute-book for its enforcement.

It is possible that the legislature, by exercising its ingenuity, might prescribe such mode of proof as would render the right of review in the courts abortive, but constitutional guaranties are not to be construed upon the hypothesis that legislators will be astute to evade them. On the contrary, we must ascribe to them the desire to enforce them in the most beneficial manner.

Whether the legislative act passed in this instance, to effect the object of this amendment, is wisely framed to that end, it is not pertinent to consider. If it is not, the infirmity is chargeable to the legislative act and not to the constitutional provision. I think it would not be difficult to devise a mode of preserving the evidence which would enable courts to adjudge, with as much certainty as is attainable in the conduct of human affairs, whether notice was duly given.

Under the statute passed by the legislature to enforce this amendment, (*Rev.*, *p.* 1125,) the publication of an act in the Pamphlet Laws is *prima facie* evidence that legal notice was given. The only counter-evidence in this case is the admission of the parties that no notice was given. Courts cannot act upon such admissions in determining the constitutionality of statutes. Facts may be admitted by parties to suits, but the law cannot be made or abrogated by agreement. Whether

Freeholders of Passaic v. Stevenson.

this statute is law or not law can be adjudged only in the mode prescribed by the legislature; it cannot be declared to be law or not law at the option of litigants. Under a law properly framed, the courts will have the probative force of record evidence to guide them as to the question of notice, and thereby all uncertainty will be eliminated.

But if the constitutional requirement as to notice had been observed, in my opinion it violates a further amendment forbidding private, special or local laws which regulate the internal affairs of counties. Such internal affairs can be regulated only by general laws. This law attempts to fix the salary of the prosecutor of the pleas of Passaic county. It is true that the prosecutor represents the state in the administration of the criminal law, and while the administration of justice within a county may not properly be termed an internal affair of the county, the amount of compensation which public officers who administer the laws shall receive from the county treasury is an affair which concerns the county alone, and not the state. This statute does not affect the administration of justice in anywise; it relates wholly to the salary which the county shall pay. Those who control the county finances are charged with the duty of raising the necessary funds to pay such salaries, and upon such laws depend the extent to which the county shall be burdened by taxation. In no respect can the internal affairs of a county be more materially regulated.

Laws relating to the mode of paying public officers by the counties, and to the amount of compensation, regulate their internal affairs equally whether such officers are engaged in administering justice or in the performance of other functions within the county. It seems very clear that the compensation of officers of the latter class can be fixed only by general laws. The reason for applying a different rule to the former class should be very clear.

The beneficial operation of this salutary constitutional provision will be greatly impaired by an interpretation which permits inequalities to any extent to be created throughout the state by special and local laws for the compensation of

prosecutors of the pleas and judges of the Common Pleas of the several counties. Such a construction would withdraw from the people of the counties the protection of this amendment where it is most needed. The imposition of the salaries of these officers upon the county in one instance, and their payment in all other counties out of the state treasury, and the payment of salary of one justice of the Supreme Court by the counties in which he presides and of all others from the state treasury, would be extreme cases, but they serve to show how clearly the internal affairs of a county may be controlled and regulated by such laws.

If laws increasing or decreasing the annual expenses of a county are to be regarded as laws regulating its internal affairs, then surely the subject matter of this controversy must be governed by general and not by local laws. Such I take to be the correct interpretation of the constitution. The act under review is therefore of no validity.

The judgment below should be affirmed.

MAGIE, J.  In my judgment the law in question, which fixes amounts to be paid to prosecutors by particular counties, (which must be raised by taxation,) is obnoxious to the prohibition of the constitution against private, local or special laws regulating the internal affairs of counties. I concur in the views expressed in the prevailing opinion of Justice Van Syckel on this subject, and on that ground I vote to affirm.

REED, J., and PARKER, J., concurred in the above view.

DIXON, J. (dissenting.)  I agree with the majority of the court in thinking that the law under consideration is local. Two questions therefore arise: First, whether it violates the constitutional amendment, forbidding local laws which regulate the internal affairs of counties. Secondly, whether it is void for non-compliance with the constitutional amendment requiring that no private, special or local bill shall be passed, unless public notice of the intention to apply therefor, and

of the general object thereof, shall have been previously given.

I. Does this law purport to regulate the internal affairs of the counties where it is to operate? It attempts to fix the salary payable by the county of Passaic to the prosecutor of the pleas of that county. Is the payment of that salary an internal affair of the county? I think not. The compensation of the prosecutor is a necessary incident of the prosecution of crimes within the body of the county, and such prosecution cannot properly be regarded as an internal affair of the county. The offences to be prosecuted are violations of state laws, committed against the peace of the state, prosecuted in the name of the state by an attorney of the state before judges appointed by the state, the penalties to be imposed are inflicted by direct authority of the state and mainly under state supervision, and whether in any case they shall be remitted is determined in a court of the state. These things have been so ever since the commonwealth existed; and they show, in my judgment, that, according to the general consent of our people, the repression of crime in each county concerns the state at large and is not an internal affair of the county. The incidents partake of the character of the principal.

II. Is the law void for want of notice?

With regard to this question, I think, first, that whether notice was given is an inquiry not open to judicial consideration. Two theories exist in this country touching the effect as evidence of a document found in the legal depository of laws and regularly certified by the usual authorities to have become a law. One is, that such a document is *prima facie* a law, but that the courts will receive other evidence, such as legislative journals, to ascertain whether the mandates of the constitution as to the mode of enacting laws were observed regarding it, and if they were not, will adjudge it null. The other is that such a document is conclusive evidence of its being a law, so that no proof can collaterally establish the contrary. This latter is the theory which has been adopted in New Jersey (*Pangborn* v. *Young*, 3 *Vroom* 29,) and it has my entire con—

currence.   The secretary of state may be regarded as the clerk of the legislative department of the government, and if there appear in his office instruments having the form of law which have not been adopted by the legislature as law, the citizen aggrieved must go to the legislature for redress, just as he would be obliged to go to a court whose records falsely showed a judgment against him.   If he says the legislature is not in session and cannot act until his injury is complete, he may be answered that the same imperfections attend the methods of judicial redress; if he suggests that the legislature is not or will not be willing to purge its records from false-hood, he must be answered that it would be indecent for courts to act on such suggestions.   The behests of the constitution as to the mode of legislative procedure are addressed to the legis-lature itself, and when that department of the government has declared that in accordance with those behests it has enacted a law, the executive and judicial departments must receive that that declaration as verity.

But while this is conceded to be the rule touching all other constitutional provisions, it is denied as to this amend-ment, because the clause directs the legislature to prescribe what shall be evidence of the giving of notice and how the evidence shall be preserved.   The argument is that because the evidence was to be preserved, it was designed to have it used to maintain or impeach the validity of the law.   The constitution does not itself express such a design; it is claimed to appear by inference only.   The reasons for such an inference seem to me to be weak and to have been substan-tially condemned in *Pangborn* v. *Young, ubi supra.*   There the question was whether the court would permit it to be shown by the journals of the legislature that the alleged law had not been voted for by a majority of each house.   The constitution in terms commands that no bill or joint resolu-tion shall pass unless there be a majority of all the members of each body personally present and agreeing thereto; that the yeas and nays of the members voting on such final pas-sage shall be entered on the journal which each house is

directed to keep of its proceedings and from time to time publish. Thus there was the express mandate of the constitution, that evidence of the fact should be made by entry on the journal under the very eye of the house, and should be preserved, by publishing it to the world, so that loss would be practically impossible; and the fact to be evidenced was the very essence of legislation. Yet these careful provisions in the text of the constitution itself did not induce the court to infer that the validity of public laws depends upon such evidence as the journals afford. Is it more reasonable to draw a parallel inference from the vague provisions now under review, which concerns only a preliminary to legislation and commits the whole subject to the discretion of each legislature? I think not.

The statute passed to carry out this amendment well exemplifies the danger of holding that the question whether due notice was given is a matter for judicial revision. It directs (*Rev.*, p. 1125,) that the notice shall contain a correct statement of the general object of the bill, be signed by at least one of the parties who intend to apply for its passage, and be published in at least one of the newspapers printed and published in every county wherever said bill is or is likely to take effect, and, if no newspaper be printed and published in said county, then in a newspaper printed and published in some adjoining county, which publication shall be at least once in each week for four consecutive weeks next preceding the day prescribed for the first assembling of the legislature in which such bill is to be introduced. It further directs that proof of the publication shall be made by an oath or affirmation in writing made by the publisher or agent of the publisher of every newspaper in which such publication was made, containing a copy of the notice published, which shall be presented with such bill when introduced, and after the final vote upon said bill shall be filed and deposited by the officers of the legislature in whose hands the same may be in the office of the secretary of state, there to remain; by the secretary it is to be recorded. Whether this statute is within constitutional limits and bind-

ing upon legislatures, while it stands, may well be doubted. The constitution is satisfied by public notice given previous to the passage of a bill, while this act requires such notice to be given before the assembling of the legislature. But if compliance with this statute is to be the final test of the existence of private, special and local laws, then, first, are the dangers of defective proof, arising out of the neglect or unskillfulness of inexpert draftsmen; and, secondly, the probability that a duty to be performed, not at a specified time, but only after a certain event, not devolved upon any particular officer, but divided among all the officers of the legislature, will be observed by none. After the supreme power of the state has pronounced its sovereign will, the operation of that will is to be kept in abeyance until, or totally defeated unless, an undesignated official, under the guidance of his own judgment, shall happen to conclude that he ought to file a printer's affidavit, which somehow has got into his hands. But if it be alleged that obedience to this statute is not requisite, but only obedience to the constitution that public notice shall be given before the passage of the bill, then the answer is that the constitution manifests a design to entrust to the legislature, and not to the courts, the right to say what shall be notice, and what the evidence of it. In my opinion, this entire clause is addressed to the judgment and conscience of the legislative bodies; they are to say, and say conclusively, as they pass upon each private, special local and bill, whether legal notice has been given; and the evidence of such notice is to be made and preserved for use in each house and before the governor, and thereafter, if at all, in order that the people may know whether their servants have regarded constitutional obligations. To that effect is the decision in *Broadnax* v. *Groom*, 64 *N. C.* 244.

As a check upon legislative power, the clause is utterly useless; for, in fact, no bill of any kind does nowadays pass either house without public notice being given, both by its public introduction and by newspaper correspondents, of the intention to apply for it and its general object, and each legislature can enact.

that this notice shall be sufficient, and that the conclusive evidence of it shall be the filing with the secretary of state of the certified bill. With such a law the legislative power would stand where it did before this amendment was adopted.

But, secondly, I think there is not, in the present case, competent proof that due notice was not given. The only evidence to that effect is the admission of the parties. In Illinois, where the courts are willing to go behind the certified bill to see whether the legislature has proceeded according to the constitution in enacting laws, they distinctly repudiate the admission of parties as proof of irregularity. *Happel* v. *Berthauer*, 70 *Ill.* 166. The point for decision is whether what seems to be a public law closely affecting the preservation of the public peace, which is certified by the general assembly, the senate and the governor to have been enacted in conformity with all the requirements of the constitution, and which, under the sanction of the government, has been promulgated as law to all the citizens of the state, is proved not to be law by the admission of two suitors. The question is not one of private concern merely; it involves the enforcement of a public statute, and, in this case, against public officers. If, on a bill for divorce, the parties should stipulate that the defendant was to be taken as guilty of the offence charged, the court would ignore the admission because the public is interested in the maintenance of the marriage state. The enforcement of a public law is quite as important to the public as is the preservation of any single marital bond. The proof to defeat the law should therefore be, not simply evidence legal against the nominal parties, but proof against the state, proof of the absolute fact, proof which constrains the conscience of the court to adjudge that a co-ordinate branch of the government has transgressed its constitutional bounds. This proof no private admission can furnish.

My conclusion, therefore, is that the statute before us was duly passed and is valid, and that therefore the judgment below should be reversed.

Jersey City Gaslight Co. v. Jersey City.

*For affirmance*—MAGIE, PARKER, REED, VAN SYCKEL, CLEMENT, COLE, PATERSON, WHITAKER.    8.

*For reversal*—THE CHANCELLOR, DIXON, KNAPP.    3.